UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

BRUCE HOLLAND,

Petitioner,

v. Case No: 5:26-cv-839-JSS-PRL

CAROLYN HOLLAND,

Respondent.
______________________________/

## ORDER

Petitioner, Bruce Holland, moves ex parte for a temporary restraining order (TRO) against Respondent, Carolyn Holland, under the International Child Abduction Remedies Act (ICARA), 22 U.S.C. §§ 9001–9011. (Dkt. 3.) Upon consideration, for the reasons outlined below, the court grants the motion.

## BACKGROUND

The court looks to the verified petition (Dkt. 1) for the facts. The parties are a married couple with two minor daughters, S.H. and E.H., as well as older children from previous relationships. (*Id.* ¶¶ 13–17.) Petitioner is a citizen of the United Kingdom, and Respondent is a citizen of the United States. (*Id.* ¶¶ 9, 11.) S.H. and E.H. were born in Florida, maintain dual citizenship with the United States and the United Kingdom, and hold American and British passports. (*Id.* ¶ 18.) According to the petition, the parties intended to raise S.H. and E.H. in the United Kingdom. (*Id.* ¶ 26.) Petitioner and Respondent lived together with S.H. and E.H. on England's Isle

of Wight from October 2019 to January 2026, (*id.* ¶ 22), and S.H. and E.H. did not leave the United Kingdom between August 2019 and January 2026 other than to take a trip to Florida in January 2025, (*id.* ¶ 25). Petitioner reports that S.H. and E.H. "attended nursery and primary school on the Isle of Wight from January 2021 to August 2025 and participated in several local activities, including gymnastics, skateboarding club, horse riding, swimming lessons, and the school soccer team." (*Id.* ¶ 27.) He further reports that because Respondent did not drive in the United Kingdom, he undertook "childcare and housekeeping responsibilities, including cooking for the family and driving the children." (*Id.* ¶ 29.)

In January 2026, Respondent took S.H. and E.H. to Florida with Petitioner's permission, as Respondent's brother was receiving end-of-life hospice care there. (*Id.* ¶¶ 30–31.) The plan was for the family to reunite in the United Kingdom after Respondent's brother died, in no "more than a few months." (*Id.*) Respondent obtained temporary employment that would end in May 2026 and told Petitioner that she and the children would return when the employment ended. (*Id.* ¶¶ 33–35.) At the time, Respondent, S.H., and E.H. lived with Respondent's adult daughter, who was pregnant. (*Id.* ¶ 36.) Petitioner states: "In May 2026, Respondent informed [him that] she wished to remain in Florida for the remainder of her adult daughter's pregnancy, because her daughter had been unwell. [Respondent] told [him that] she and the children would return to the [United Kingdom] following her grandchild's birth in late July 2026." (*Id.* ¶ 40.) Shortly after the birth, in August 2026, Respondent told Petitioner that she intended to remain with S.H. and E.H. in Florida indefinitely.

(*Id.* ¶¶ 43–45.) Petitioner made clear that he did not consent to this new arrangement and wanted the children to return to the United Kingdom immediately. (*Id.* ¶ 46.)

Petitioner reported the situation to a local police department in the United Kingdom, and the police advised him to communicate with the International Child Abduction and Contact Unit (ICACU). (*Id.* ¶ 49.) Petitioner indicates that he "filed his [a]pplication for [c]hild [r]eturn . . . with the ICACU on or about August 15, 2026—less than one week after learning Respondent intended to keep the children in Florida." (*Id.* ¶ 50.) He further states that "[i]n collecting the necessary documents" for the application, he discovered that "Respondent had covertly taken her own birth certificate, the children's birth certificates, and the [p]arties' marriage certificate when she traveled to the [United States] in January 2026." (*Id.* ¶ 51.) The United States Department of State received Petitioner's application from the ICACU and asked Respondent if she would agree to return S.H. and E.H. to the United Kingdom. (*Id.* ¶ 52.) She refused. (*Id.* ¶ 53.) Accordingly, in November 2026, Petitioner filed the verified petition under the ICARA, seeking S.H. and E.H.'s immediate return to his custody in the United Kingdom, as well as the costs incurred in this action. (*Id.* at 15–16.) The same day, Petitioner filed the instant motion (Dkt. 3) to prevent Respondent from relocating S.H. and E.H. without his knowledge while the verified petition (Dkt. 1) is before the court.

## APPLICABLE STANDARDS

TROs serve "to preserve the status quo until there is an opportunity to hold a

hearing." *United States v. Kaley*, 579 F.3d 1246, 1264 (11th Cir. 2009) (Tjoflat, J., specially concurring) (quotation omitted). A court may issue a TRO without notice to the adverse party only upon a showing that "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," provided that the movant's attorney "certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). A TRO "must state the date and hour it was issued[,] describe the injury and state why it is irreparable[,] state why the order was issued without notice[,] and be promptly filed in the clerk's office and entered in the record." Fed. R. Civ. P. 65(b)(2). A TRO may not remain in effect for more than fourteen days, unless the court grants one fourteen-day extension for good cause or the adverse party consents to an extension. *Id.* "The reasons for an extension must be entered in the record." *Id.* A legal memorandum in support of a motion for a TRO must satisfy four requirements: (1) "the likelihood that the movant ultimately will prevail on the merits of the claim," (2) "the irreparable nature of the threatened injury and the reason that notice is impractical," (3) "the harm that might result absent a restraining order," and (4) "the nature and extent of any public interest affected." M.D. Fla. R. 6.01(b).

## ANALYSIS

Upon consideration of the verified petition (Dkt. 1) and the instant motion (Dkt. 3), the court concludes that Petitioner has satisfied his burden to warrant entry of the requested TRO. Petitioner seeks relief pursuant to the ICARA, which implements the Hague Convention on the Civil Aspects of International Child Abduction. *See*

*Fernandez v. Bailey*, 909 F.3d 353, 359 (11th Cir. 2018); *see also* Int'l Child Abduction Convention Between the United States of Am. & Other Governments Done at the Hague Oct. 25, 1980, T.I.A.S. No. 11670, 1988 WL 411501 (the Hague Convention). The Hague Convention "furthers its goal of 'discourag[ing] child abduction,' by requiring signatory states to make available a remedy whereby parents of abducted children can bring proceedings to compel the return of their children who have been taken to foreign countries." *Fernandez*, 909 F.3d at 358–59 (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014), and citing Hague Convention arts. 7, 12). Under the ICARA, a court "may take or cause to be taken measures under [f]ederal or [s]tate law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition." 22 U.S.C. § 9004(a).

To prevail on his Hague Convention petition, Petitioner must demonstrate by a preponderance of the evidence that S.H. and E.H. were habitually resident in the United Kingdom when Respondent refused to return the children, that the refusal to return the children was without Petitioner's consent and constituted a wrongful breach of his custody rights under United Kingdom law, and that Petitioner was actually exercising his custody rights when Respondent refused to return the children. *See Seaman v. Peterson*, 766 F.3d 1252, 1257 (11th Cir. 2014) ("[The petitioner] was required to prove by a preponderance of the evidence . . . (1) that the children were habitually resident in Mexico at the time [the respondent] removed them to the United States[,] (2) that the removal was without [the petitioner]'s consent and constituted a

wrongful breach of her custody rights under Mexican law[,] and (3) that she was actually exercising those custody rights at the time of the removal." (citing Hague Convention art. 3 and *Ruiz v. Tenorio*, 392 F.3d 1247, 1251 (11th Cir. 2004))); *see also* 22 U.S.C. § 9003(e)(1) (requiring that a petitioner establish by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the [Hague] Convention"). A minor child's habitual residence is established by "facts indicating that the parents have made their home in a particular place." *Monasky v. Taglieri*, 589 U.S. 68, 81 (2020). Petitioner has submitted evidence to support each requirement for success on the merits. Specifically, Petitioner asserts in the verified petition that S.H. and E.H. resided in the United Kingdom for years prior to January 2026, that they participated in school and local activities in the United Kingdom, where the parties intended to raise them, that Respondent is retaining the children in the United States contrary to Petitioner's express wishes, and that Petitioner has been exercising his parental rights. (Dkt. 1 ¶¶ 21–22, 25–29, 46, 48–50.) The court deems this evidence sufficient to raise a likelihood that Petitioner will succeed on the merits of the petition. *See Romanov v. Soto*, No. 3:21-cv-779-MMH-MCR, 2021 WL 4033576, at *1, 2021 U.S. Dist. LEXIS 167637, at *3 (M.D. Fla. Sept. 3, 2021) ("Upon review of the [v]erified [p]etition, the [c]ourt determines that some relief is warranted to assure the continued availability of the [m]inor [c]hildren pending a hearing on the merits of the [v]erified [p]etition.").

Further, Petitioner has established the irreparable nature of the threatened injury and the reason that notice is impractical. Petitioner asserts: "If Respondent

learns [that] Petitioner has filed a judicial action seeking the children's return to the [United Kingdom] prior to the [c]ourt securing Respondent's appearance . . . and obtaining the children's passports/travel documents, Respondent may take drastic action to prevent the children's return . . . ." (Dkt. 3 at 8–9.) Petitioner notes that Respondent has "covertly taken her own birth certificate, the children's birth certificates, and the [p]arties' marriage certificate." (Dkt. 1 ¶ 51.) This evidence supports that Respondent may attempt to conceal the children from Petitioner or hinder these proceedings, thereby causing irreparable injury. *Gonzalez v. Solin*, No. 8:22-cv-1091-CEH-JSS, 2022 WL 1912896, at *3, 2022 U.S. Dist. LEXIS 99760, at *7 (M.D. Fla. June 3, 2022) (agreeing with the petitioner that difficulties in locating the respondent if she moved posed a risk of irreparable harm); *Watson v. Watson*, No. 8:22-cv-2613-WFJ-TGW, 2022 WL 16963830, at *2, 2022 U.S. Dist. LEXIS 208167, at *4 (M.D. Fla. Nov. 16, 2022) ("[The] ICARA permits a court to 'prevent the child's further removal or concealment before the final disposition of the petition.'" (quoting 22 U.S.C. § 9004(a))).

The court additionally concludes that the balance of harms weighs in favor of granting the TRO, as the requested relief merely preserves the status quo. *See Kaley*, 579 F.3d at 1264. Moreover, the public interest is served by enforcing the Hague Convention through the ICARA, which "empower[s] courts in the United States to determine only rights under the [Hague] Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4); *see De La Riva v. Soto*, 183 F. Supp. 3d 1182, 1186 (M.D. Fla. 2016) ("Together, the Hague Convention and

ICARA are 'intended to restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court for custody hearings.'" (alteration adopted) (quoting *Hanley v. Roy*, 485 F.3d 641, 644 (11th Cir. 2007))); *Watson*, 2022 WL 16963830, at *2, 2022 U.S. Dist. LEXIS 208167, at *5 ("[I]ssuing the requested [TRO] would not be against the public interest.").

Federal Rule of Civil Procedure 65 provides: "The court may issue . . . a [TRO] only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The court considers it proper to require no security in this instance. *See BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) ("[I]t is well-established that the amount of security required by the rule is a matter within the discretion of the trial court, and the court may elect to require no security at all." (alterations adopted and quotation omitted)); *Gomez v. Jimenez*, No. 15-cv-23021-KMW, 2015 WL 12778640, at *2, 2015 U.S. Dist. LEXIS 187309, at *6 (S.D. Fla. Aug. 13, 2015) ("The [c]ourt finds that, for now, no security is necessary in this case[,] as there is no evidence that [the r]espondent will suffer any costs or damages from the entry of [the TRO].").

**CONCLUSION**

Accordingly:

1. Petitioner's ex parte motion (Dkt. 3) is **GRANTED**.
2. Respondent or anyone acting in concert with her or on her behalf shall not

remove S.H. or E.H. from the jurisdiction of this court until the court resolves the petition (Dkt. 1) or orders otherwise. If Respondent or anyone acting in concert with her or on her behalf removes S.H. or E.H., or causes them to be removed, from the court's jurisdiction, the court will issue a warrant for that individual's arrest and appearance for a contempt hearing and will order S.H. and E.H.'s names to be entered into the National Crime Information Center's missing persons database.

3. The court will set the petition (Dkt. 1) for a hearing by a separate order. Respondent shall appear before the court in person for the hearing and may bring counsel to represent her. Petitioner, who lives in the United Kingdom, is excused from personally appearing at the hearing provided that Petitioner's counsel appears on his behalf. If Respondent fails to appear for the hearing, the court will issue an order directing S.H. and E.H.'s names to be entered into the National Crime Information Center's missing persons database and will issue a warrant for Respondent's arrest and appearance for a contempt hearing.

4. The United States Marshal Service (USMS) shall forthwith serve Respondent with the petition (Dkt. 1), the motion (Dkt. 3), this order, and the order setting the hearing on the petition, along with any attachments to these documents. Service shall be made at Respondent's address, 13413 Silver Leaf Circle, Clermont, Florida 34711, or alternatively, at Respondent's former address, 2837 Carter Jones Road, Groveland, Florida 34736. In the event that the USMS is unable to serve Respondent in accordance with this paragraph, the USMS shall

notify the court forthwith.

5. At the time of service, Respondent shall surrender to the USMS all passports, including American and British passports, and all other travel documents for Respondent, S.H., and E.H. that are in her possession, custody, or control, or to which she otherwise has access, to be held for safekeeping by this court pending the resolution of the petition (Dkt. 1) or further order of the court.
6. Respondent shall maintain correct current contact information with the court at all times until the petition (Dkt. 1) is resolved or the court orders otherwise.

**ORDERED** in Orlando, Florida, on November 19, 2026, at 9:30 A.M. E.T.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties